IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


RODERICK J. HANKS,

          Plaintiff,


          vs.                      Case No. 16-1007-JTM


SPIRIT AEROSYSTEMS, INC.,
     A Delaware Corporation,

          Defendant.



MEMORANDUM AND ORDER


     Plaintiff Roderick Hanks, an employee of Spirit Aerosystems, has sued Spirit for racial harassment and discrimination, retaliation, and disability discrimination. Spirit has moved for summary judgment on Hanks' claims. For the reasons provided herein, the court finds that the defendant's motion should be granted.


*Findings of Fact*

     Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have

no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Background*

Spirit hired Hanks in March 2006 as an assembly mechanic. He soon became a level C tooling technician, then increased to a level B tooling technician, and was eventually assigned to the cutter crib in May 2011.

Hanks steadily received pay increases throughout the course of his employment. When he was assigned to the cutter crib, he received an hourly wage of $24.95; Hanks now earns over $32 per hour.

Hanks has had two first-level managers in the cutter crib. Dean Lebeda was Hanks' first-level manager from May 2011 until March 2013. Jim Kalal has been Hanks' first-level manager since March 2013.

Hanks has not received any discipline since moving to the cutter crib in 2011, has not been transferred or demoted, and his job duties have not changed in a negative manner.

At all times during Hanks' employment with Spirit, Spirit has maintained a policy prohibiting harassment and discrimination, and requires employees to complete periodic training with respect to preventing discrimination and harassment. Spirit also periodically reminds employees of its policy, including that the repercussions of violating it may include termination. Spirit's policy is stricter and prohibits more conduct than state and federal law when it comes to harassment, discrimination, and retaliation; thus, a finding that Spirit policy has been violated does not mean that federal or state law was also broken. Spirit's EEO office investigates complaints of harassment, discrimination, or retaliation.

Hanks participated in Spirit's training, was aware of Spirit's Discrimination and Workplace Harassment Procedure, and knew Spirit required him to report any alleged discrimination or harassment to the company's EEO.

Spirit prohibits all employees, supervisory or not, from discriminating or retaliating against employees who participate in EEO investigations. EEO investigators instruct supervisors and respondents that such actions against an employee are prohibited.

Hanks has filed six complaints with the EEO office since May, 2011 — five complaints related to his race and one to his alleged disability. Spirit's EEO office promptly and thoroughly investigated each complaint and Hanks does not contend they did anything wrong or should have done anything more. Hanks knew Spirit's process for reporting incidents of discrimination and harassment. He admits that he failed to utilize Spirit's reasonable procedure for reporting "day to day" incidents he now claims were discriminatory and harassing.[1]

---

[1] In his response, Hanks controverts these contentions by Spirit because they are "not supported by the factual statements made by Mr. Hanks at the cited portions of his

*August 7, 2012 Complaint*

On August 7, 2012, Hanks complained about the actions by three workers: Scott Ingram, Robert Robinson, and Dean Lebeda. The allegations relating to Robinson (who was disciplined for his behavior) have nothing to do with race discrimination and are not at issue in this lawsuit. Hanks alleged that Ingram said "nigger please" to him. He also stated he had "been around [Ingram] for a year and he never said anything like that." Hanks believed that he and Ingram were friends — he had helped Ingram with hay outside of work and the two had gone fishing together. Hanks had been to Ingram's house twice before the August 2012 complaint. Hanks alleged that Lebeda referred to the music Hanks was playing "jigaboo" music.

Lucretia Taylor promptly and thoroughly investigated Hanks' complaints and interviewed nine employees, including the respondents and all witnesses identified by Hanks.

Ingram admitted to saying the "N word" in a conversation with Hanks. In his statement, Ingram stated that he thought he and Hanks were friends, that he had heard Hanks say the word twice, and that after Ingram said "nigger please," Hanks responded with "whatever cracker." Ingram believed they were joking. Ingram and his wife have a black son.

The investigation confirmed a violation of Spirit's Discrimination and Workplace Harassment Procedure with regard to Ingram, and Ingram was disciplined.

Though Hanks subsequently alleged that Ingram used a racially derogatory term in April 2015 — more than two years after Ingram was disciplined in 2012 — Spirit EEO did not

---

deposition." (Dkt. 76, at 2). The court finds the attempted denial ineffective. First, the contentions are fair summaries of Hanks' deposition testimony. (Hanks dep. 333, 334-38, 413-14). Second, Spirit's contentions are supported by evidence from other sources, and Hanks fails to supply any evidence which would place this evidence in controversy. Third, Hanks fails to challenge most of the other contentions of fact in Spirit's lengthy memorandum, many of which also demonstrate that the company actively investigated his complaints.

confirm that 2015 allegation, and no other employee has ever complained to EEO that Ingram has ever used racially derogatory language.

Manager Lebeda denied making the "jigaboo" music comment. The investigation did not confirm that Lebeda made the "jigaboo" comment, but confirmed Lebeda called Hanks a troublemaker in front of other employees. Lebeda received a counseling session, and was instructed to treat all employees with dignity and respect.

Hanks does not mention Lebeda in any other statement provided to EEO or Spirit Security. The EEO has never confirmed that Lebeda has ever made any racially derogatory comments.

Taylor informed Hanks that the facts gathered in the investigation confirmed a violation of Spirit policy and that appropriate action has been or will be taken.

Hanks did not report any workplace concerns or complaints to EEO between his August 2012 complaint and his May 2014 complaint, and Hanks does not identify any alleged racially discriminatory, harassing, or retaliatory conduct during this time period.

*May 27, 2014 Complaint*

In May, 2014, Hanks alleged that Ingram was refusing to train him on Ingram's machine, that Hanks was missing out on overtime as a result, and that he did not have the right programs installed on his machine. The complaint was investigated by outside counsel, who interviewed ten employees, including Hanks, the respondents, and alleged witnesses.

The investigation did not confirm Hanks' complaint. Ingram denied the allegations against him and affirmed his willingness to train Hanks. The witnesses Hanks identified to substantiate Ingram's alleged statements that he would not train Hanks denied hearing Ingram make the remarks. Hanks admitted that certain programs he had requested were installed on his machine prior to filing a complaint and he could not identify what specific

programs he was missing. The investigation also could not confirm Hanks' allegations regarding overtime.

In his Response, Hanks points to the statements of a co-worker, Gary Fullerton, who stated that Hanks had been deprived of overtime. Fullerton believed that statements that Hanks was unqualified for overtime were a "total fabrication" because he himself worked "tons of overtime." Hanks also cites his own statement that his manager Lebeda told him that he would "throw those fucking cutters away before I let you work overtime."

Spirit responds in part by noting that Fullerton and Hanks were not similarly situated, as Fullerton at the time had worked in the crib for some 17 years, Ingram for eight years, and Hanks for three. More importantly, Hanks does not controvert the other facts presented by Spirit with respect to the 2014 complaint, including the fact that, when asked about the issue, Hanks admitted in his deposition that he was not actually taken out of the weekend rotation. He agreed that he made a weekend rotation in approximately October 2013, and that it has been followed ever since, with minor deviations when people have forgotten who is up next to work overtime.

It is also uncontroverted that, when questioned about what programs he did not have on his machine, Hanks could not identify specific programs, but stated that if someone brings him a cutter that he does not have the program for, then he cannot run the cutter. Hanks could not identify any programs that he had asked for and did not receive, any programs he did not have that he wanted, or programs that other machine operators had that he did not have. He also could not specifically identify more than one or two instances, over the course of almost six years, when he received a job that he could not complete.

There are five ANCA machines in the cutter crib. The different ANCA machines are "dedicated to different kinds of cutters" and run different cutters. Different operators are assigned different machines and different types of cutters in order to improve efficiency. Although most of the machines are technically capable of running each type of cutter, it

would require more down time in between running each cutter and does not make business sense.

Hanks testified that the shop receives cutters of lots of different sizes and that it is not discriminatory to divide up cutters by sizes among the crew. Hanks is the only person in the shop who regularly runs the large cutters.

Hanks did not identify any "training" he requested but did not receive. He identified not having programs on his machine as the training that he has not received.

According to Hanks, he asked Lebeda for programs on his machine "from the time that [the prior operator] retired." (Hanks dep. at 193). Hanks replaced the retiree on the ANCA machine in January, 2012. Hanks did not identify the lack of programs as a complaint in his August 2012 EEO statements.

Hanks also alleged in his May 27, 2014, complaint that he believed "Jim [Kalal] is racist." He identified no evidence other than his personal belief to support this claim. Hanks stated in his deposition that he no longer believes Kalal is racist.

### December 3, 2014 Complaint

On December 3, 2014, Fullerton found on a union bulletin board a picture of a black man holding a sign that said, "No mother should have to fear for her son's life every time he robs a store."

Fullerton told Hanks, who was the only African-American in the crib, about the picture, and Hanks called Spirit Security, which immediately removed the posting and began an investigation.

Hanks' manager Jim Kalal was out of town when the incident occurred, so another manager, Henry Burns, was contacted and instructed to address the situation. Burns spoke with employees in the area, as well as the team lead, but was unable to determine who posted the picture.

Hanks gave a statement to Lucretia Taylor of Spirit's internal EEO office on December 4, 2014, regarding the anonymous posting. He did not know who placed the posting on the bulletin board.

It is uncontroverted that Taylor immediately and thoroughly investigated the complaint and met with five witnesses, including Hanks, and coordinated with the investigation by Spirit Security.

Spirit Security attempted to determine who had printed the picture, but their investigation was unsuccessful because Security determined that the paper was not printed at Spirit. During the investigation, no one admitted to posting it, nor did anyone see who posted it.

To prevent future occurrences, the bulletin board in the cutter crib was enclosed with glass and a lock and key to prevent anyone from posting materials without approval. This occurred within about one week of the incident.

Hanks met with Taylor on February 9, 2015, to close out the investigation. Taylor told Hanks that although the investigation could not identify the person who posted the picture, the facts gathered in the investigation confirmed a violation of Spirit Policy and that appropriate action was taken.

Hanks has not witnessed any offensive pictures or posters in the workplace since the December 3, 2014, posting.

### April 15, 2015 Complaint

Hanks filed a complaint with Spirit's EEO office on April 15, 2015, alleging he overheard Ingram say the word "nigger" twice, and that he heard co-worker Jordan Light yell "boy." Hanks does not allege that the terms were directed at him and does not know the context of the use of the terms.

After Hanks heard Ingram use the "N" word, he put in his earbuds and listened to

his music. Hanks believed he heard the word "boy" while he was listening to his music, and when he took out his headphones thought he heard James Frey ask Light "what does it sound like I am saying" and Light responded "boy."

It is uncontroverted that Brenda Zobkiw, another EEO investigator, promptly and thoroughly investigated Hanks' complaint and interviewed ten employees, including Hanks, the alleged respondents, and witnesses, including all witnesses identified by Hanks, in the course of her investigation.

None of the employees interviewed confirmed Hanks' allegations. In fact, both Ingram and Frey denied using the language Hanks alleged. Moreover, witnesses who would have been within hearing distance all denied that Ingram or Frey used that language.

Ultimately, Spirit's EEO office did not find a violation of policy. Since the filing of Hanks' April 15, 2015 complaint, Hanks has not witnessed any other alleged racial epithets in the workplace.

*May 2015 EEOC Charge*

Hanks submitted a charge of discrimination to the EEOC on May 8, 2015, alleging that he had been discriminated against on the basis of race, color, and disability, and that he had been retaliated against. The charge identifies the December 2014 poster incident, and alleges he was subjected to racial epithets including, "nigger," "boy," and "monkey." He attributed these comments to co-workers Ingram, Frey, Light, and Frank Garcia.

Hanks has testified that, at some unknown point in time, co-worker Garcia said "a monkey could run this machine." He has "no idea" when this happened, but believed it was "quite some time ago" and before his prior EEO complaints. Hanks wondered why the co-worker wanted to work on the machine if the co-worker thought a monkey could run it.

The "monkey" allegation does not appear in any of Hanks' statements to EEO or Security made over the years. At the time he made the statements, Hanks reviewed every

statement and had the opportunity to revise or add to his statements before signing the statements. He did not revise any of his EEO or Security statements to include the allegation regarding Garcia using the word "monkey."

When asked in his deposition about supposed racial epithets by Light. Hanks stated that Light responded with the word "boy" in response to a question about what it sounded like Frey had said. Otherwise, Hanks never heard Light use any supposed racial epithets. Hanks does not allege Light made any other alleged racial epithet.

The 2015 EEOC Charge is the first time Hanks alleged he was discriminated against on the basis of disability.

Hanks could not identify any other alleged racial epithets when asked if there were any other incidences of racial epithets other than the incidences already discussed above. He does not recall hearing any racial epithets used in the workplace since the alleged statements in April 2015.

On May 28, 2015, Hanks texted EEO Investigator Zobkiw advising that a co-worker was wearing a t-shirt that said "don't task me bro." He then corrected "task" to "tase." Zobkiw called Kalal and asked him to confirm the t-shirt and requested that Kalal have the employee cover or change his shirt. Spirit directed the employee to cover up the t-shirt.

On May 29, 2015, Hanks provided a statement to Spirit's EEO office regarding the t-shirt. Zobkiw promptly and thoroughly investigated Hanks' complaint, and interviewed four employees, including Hanks, the respondent, Hanks' manager, and an alleged witness.

Hanks initially thought that the t-shirt was racially motived, but later learned the t-shirt related to rumors that Spirit's Security department had purchased tasers, and was based on a YouTube video of a white college student in Florida who was tased by an officer and said "Don't tase me, bro" during the video. Hanks later came to understand that the t-shirt had no racial connection to it and does not allege the t-shirt was related to race.

The investigation did not find a violation of Spirit policy. Nonetheless, and even

though Hanks admits there were no racial connotations associated with the shirt, EEO still took action to have the employee immediately cover up the t-shirt in response to Hanks' complaint.

### October 28, 2015 Complaint

Hanks works in a manufacturing plant with large equipment and parts and the potential for serious injury; he does not work in an office environment. In October, 2015, Spirit workers reported a "near miss" with other employees walking through the shop and utilizing a nearby exterior door. Sherry McCracken, the manager in the shop area directly inside the door, consulted with Spirit Safety and had a cypher lock placed on the door.

At that time, nine employees parked in the handicapped parking stalls located outside the inspection area where the lock was installed. The lock code was given to two employees with handicap parking stalls. Both employees have visibly obvious ambulatory restrictions. One employee, Kim Gamble, has cerebral palsy, can hardly walk, and uses walking canes. The other employee, Billy Powell, has Multiple Sclerosis and is able to do limited walking, from his car to the door, where he keeps a wheelchair.

Hanks does not have work restrictions specifying a distance he can walk, but does have a handicap placard which allows him to park in handicap parking stalls. Because he has this placard, Hanks has been permitted to park inside of Spirit's gates, closer to the Spirit building where he works.

There are three doors near Hanks' parking stall, which is adjacent to and on the south side of Plant II. Two of the doors are designated pedestrian entrances, and one door opens directly into a shop area of Plant II. The east pedestrian entrance is about 116 feet from the stall, the west pedestrian entrance is 123 feet away.

One of the inspectors who worked in the area gave Gamble and Powell the lock code and told them not to give the code to anyone.

Hanks asked for the code from McCracken, who told him "they were not giving out the code because it was a safety issue." She asked Hanks to use a pedestrian entrance.

Another, white employee who had a handicap parking stall but no visibly obvious ambulatory impairment was also not provided the code to the door.

Hanks filed a complaint with EEO on October 28, 2015, regarding the lock. Zobkiw promptly and thoroughly investigated Hanks' complaint, and interviewed seven employees, including Hanks, McCracken, and five alleged witnesses.

Hanks was provided with the lock code on November 6, 2015, nine days after his complaint. During the time Hanks did not have the code, he parked in his normal parking stall inside the Spirit security checkpoint and used one of the designated pedestrian entrances located an additional 35 or 42 feet from his stall, depending upon which entrance Hanks used.

The cypher lock was removed on December 18, 2015.

In his deposition, Hanks stated that once they gave him the code, they took the lock off the door, and this led him to believe the lock incident was racially motivated. His only other allegation to support this contention is that employees who were given the lock were told not to give it out. Hanks did not tell the EEO that he believed the cypher lock was placed on the door and subsequently removed because of his race.

It is uncontroverted that the cypher lock was removed because it was causing more drama and distraction than it was worth, as employees continued to use the door and McCracken and her employees received numerous complaints. The complaints, coupled with the fact that people continued to use the door, created more distraction than the lock was worth in McCracken's opinion.

The shop door is not a designated employee entrance. In order for Hanks to travel from his parking stall to the cutter crib, he had to pass the western pedestrian entrance. Although the western pedestrian entrance requires Hanks to walk approximately 43

additional feet outside, it is a shorter overall walking distance from the parking stall to the cutter crib if one uses the western pedestrian entrance, because it allows for a more direct path with fewer obstacles to walk around.

The eastern pedestrian entrance is approximately 35 additional feet from Hanks' stall than the shop door, but has an area immediately inside the door where Hanks could park his bicycle. If Hanks were to use his bicycle and park it near whatever door he uses, utilizing the eastern pedestrian entrance would minimize the distance Hanks is required to walk because although the eastern pedestrian entrance is approximately 35 further feet from Hanks' parking stall, he can park his bicycle immediately inside the door, whereas he cannot park his three-wheeled bicycle immediately inside the shop door as there is not space to do so immediately inside the door and Hanks would have to walk further than 35 feet inside Plant II to access his bicycle.

### January 2016 Charge

Hanks filed a second EEOC charge on January 21, 2016. This complaint is identical to the 2015 charge, except it adds allegations that (1) "I have been discriminated against in violation of my rights to be free of racial discrimination in the workplace," (2) "I have recently been discriminatorily denied access to my work area that other similarly situated, non-disabled employees have been granted," and (3) "I have recently been retaliatory denied access to my work area that other similarly situated employees have been granted."

McCracken was not aware of Hanks' prior internal or external complaints when the cypher lock was installed or when it was removed. Hanks never reported to McCracken. Other than his telling her about his handicap placard, McCracken had no information regarding Hanks' alleged disability.

### Overtime

Hanks alleges that when he was first assigned to the cutter crib, Lebeda would not let him work overtime, and has testified that he reported this concern to EEO at the time of his August 2012 complaints. However, the issue of overtime does not appear in either of his August 2012 statements.

During the first sitting of his deposition, Hanks alleged that before he arrived in the cutter crib, "[Ingram] pretty much worked all the overtime. And then when [Light] came, he and [Ingram] worked the overtime. And there was a period of over two and a half years that I wasn't allowed to work overtime." (Hanks dep. at 221). Hanks could not identify the 30-month period he was supposedly not allowed to work overtime.

In the second sitting of his deposition, Hanks alleged that only Ingram and Fullerton (not Light) worked overtime under Lebeda, and that Hanks did not work overtime until Kalal arrived in the shop. Hanks alleged the only time Lebeda allowed him to work overtime was after the tornado in April of 2012 and that this lasted for approximately "a month or so."

Hanks testified that Ingram and Fullerton received more overtime because Lebeda and Ingram were friends and because Lebeda was scared of Fullerton (who was the shop's union steward). Hanks does not allege anyone besides Ingram and Fullerton received more overtime under Lebeda.

Hanks testified that when he became the union steward in 2013, he implemented an overtime rotation. He also testified that, prior to the alleged rotation, only Light and Ingram worked weekends. When a white co-worker, David King, and Hanks were added to the rotation, Hanks claims he was told by a co-worker (not a manager) that Light needed to work the extra time because he was trying to save money to buy a house and King and Hanks cut into that extra time.

According to Hanks, since October 2013, there has been a weekend rotation in effect and that it has generally been followed except when people have forgotten who is next.

Hanks' overtime claim is based upon an alleged failure to receive overtime from May 2011 through October 2013.

The facts establish that Hanks was assigned to the cutter crib in May 2011 and was initially assigned to a conventional machine. According to Hanks, he was assigned to the ANCA machine after the previous operator, who is white, retired on January 19, 2012. Lebeda decided to assign Hanks from the conventional machine to the ANCA machine. The ANCA machine is a more favorable assignment in the cutter crib because it requires less manual labor, as it involves controlling a machine through a computer, and provides the opportunity to work more overtime due to the demand of cutters that are run through the machines.

Hanks received approximately 61.8 hours of overtime total in 2011, with only 11.9 of these hours coming prior to his assignment to the cutter crib and almost 50 hours of overtime in the cutter crib. Hanks did not receive more overtime in the cutter crib in 2011 because he was new to the cutter crib and required training and was assigned to a conventional machine and operators of conventional machines did not receive as much overtime due to the nature of the position and work demands.

He also had an approximate five week leave of absence in the Fall of 2011, and returned with work restrictions limiting the number of hours he was allowed to work in one day. Another conventional machine operator, William Tucker, who is white, received only 11.8 total hours of overtime in 2011.

Hanks always received more overtime than the conventional machine operators in the cutter crib.

After management assigned Hanks to the ANCA machine in late 2011 or early 2012, Hanks worked approximately 426.5 hours of overtime in 2012, receiving the seventh most overtime of employees in the shop and receiving more overtime than 12 white co-workers.

Hanks did not work weekend overtime immediately after his assignment to the

ANCA machine because it was Lebeda's practice not to assign weekend overtime to employees that are training because weekend overtime is largely unsupervised. But for the final three quarters of 2012, Hanks received more overtime hours than white ANCA operator Fullerton, and only slightly fewer overtime hours than white ANCA operator Ingram, with all three operators working between 400-500 hours of overtime during this time frame.

In 2013, Hanks worked approximately 436 overtime hours, received the fourth highest number of overtime hours in the cutter crib, and received more overtime hours than ten white employees in the cutter crib.

In 2014, Hanks received approximately 272.5 overtime hours, more than 16 white co-workers. In 2015, Hanks received approximately 323 overtime hours, more than 19 white co-workers, including all of the other ANCA operators, Light, Ingram, King, and Fullerton. Hanks took turns receiving the most overtime among other ANCA operators.

Hanks always received more overtime hours than Light, when both employees were assigned to the cutter crib.

Spirit distinguishes between "period overtime" and weekend overtime. Period overtime occurs, for example, when an employee is scheduled to work eight hours on a day and works more than eight hours, either working before or after the assigned shift. Any time worked over the assigned eight hours during the regularly scheduled Monday through Friday workweek is "period overtime." Weekend overtime occurs on the weekend, outside of the employee's normally scheduled workweek.

Whether an employee received period overtime depended upon whether the employee had cutters typically run on their machine that needed to be grinded. Different machines were designated to run different types of cutters. When there was a backlog or demand for certain types of cutters, the employee that ran that machine would work the period overtime. Lebeda followed this practice both before and after Hanks was assigned

to his ANCA machine. This is the practice also followed by Kalal.

Hank attempts to controvert Spirit's contentions as to the overtime work by again referencing the statement by Fullerton, which has been noted earlier, as to his subjective belief that there was an effort to avoid giving Hanks overtime. But Hanks fails to controvert the evidence of the actual overtime hours worked by Hanks and other crib workers.

Hanks also alleges that Lebeda, his manager in 2012, allowed white employees such as Fullerton and Ingram to work overtime, but at the same time told Hanks that he would "throw those fucking cutters away before I let you work overtime to, to grind them." (Hanks dep. at 403).

Spirit denies Lebeda made any such comment, and notes that Hanks did not include any reference to the alleged comment in his signed EEO complaint over the issue. More importantly, it remains that Hanks in fact worked hundreds of hours of overtime under Lebeda. Hanks worked more overtime than most white co-workers. In fact, in the final three quarters of 2012, Hanks worked more overtime than Fullerton and almost as much as Ingram.

Hanks testified that he could not identify any overtime opportunities he believed he has missed out on since Kalal became the manager, aside from one weekend in July 2016.

The Union contract between the IAM and Spirit addresses overtime. It allows an employee to file a grievance if an employee believes he or she should have received overtime and another employee received overtime in his or her stead.

Hanks knew how to file a grievance if he believed he was not given overtime when it was his turn for overtime and has filed two grievances since 2014—the time period he does not claim he was denied overtime—each covering a discrete weekend.

Hanks filed a grievance seeking back pay for not working over the weekend of February 14 and 15, 2015. Hanks believed Ingram worked overtime that weekend, but he did not. No one in Hanks' job code worked any overtime on the two days in question.

Hanks did not state in the grievance he believed he was not given overtime because of his race, nor did he report this issue to EEO.

Hanks filed a second grievance relating to overtime allegedly missed over the Fourth of July holiday in 2016, the weekend of July 2, 2016. He alleged that he was told no one was working over the Fourth of July weekend, but then he found out that Ingram worked. Hanks had been originally scheduled for the Fourth of July weekend, while Ingram was scheduled the weekend of July 9.

Kalal swapped Ingram and Hanks so that Ingram worked the Fourth of July and Hanks worked the following weekend of July 9.

In any event, Hanks prevailed on his grievance and was paid for two days of overtime (July 2 and 3) that he did not work. Hanks does not have a wage loss associated with the July 2, 2016, weekend.

Hanks has not alleged any other overtime opportunities missed since Kalal was assigned to the cutter crib.

*Co-Worker's Noose Incident*

Hanks has testified that during a short conversation, a co-worker, Tim Herod, told him in passing that a noose had been left in Herod's work area. Hanks in his response stresses his deposition testimony that Herod's work area is in the "same building" as him, that it is near the cutter crib shop, and that crib workers may pass by the area when they deliver cutters to the machine operators. (Dkt. 78, at 21).

But nearby is a relative term. The manufacturing area of Spirit Plant II occpies 1.72 million square feet. More importantly, Hanks himself testified that he does not know where Herod works within Spirit, and indeed admits that it is a "whole different area." Hanks testified that "I know he works at Spirit. I don't know what, what area he is in, where he's located." (Hanks dep. at 366).

He described the building as several football fields in dimension. He also testified that Herod's work area is enclosed and separated from the cutter crib and other shops by a wall and doors. He testified that "the only time" he would see Hanks is if he went to the cafeteria.

It is uncontroverted that Hanks never saw the alleged noose, and did not participate in the investigation undertaken by Spirit's EEO department. The alleged noose incident involved a different shop, different managers, and occurred in a separate area from the cutter crib. Hanks did not know the identity of the employees in Herod's shop, who his manager was, who supposedly placed the noose in the area, or any other details regarding the alleged incident.

According to Hanks, Herod told him about the alleged noose during a less than "couple minute" conversation that occurred in passing. Other than the brief mention, Hanks and Herod have not had any substantive discussions regarding this or any other racially derogatory incident. Herod and Hanks are acquaintances, but not friends and do not spend significant time talking to each other at work.

The Spirit EEO conducted a thorough investigation into the incident, but there were no witnesses to the incident and no employee admitted fault. However, EEO conducted additional anti-harassment training in January 2015 for the specific shop affected, and there have been no further allegations of any racially related conduct directed at Herod since that training.

### Disability Claim

Hanks claims he suffers from spinal injury to his leg and back, as well as heart disease and stroke. When Kalal took over for Lebeda, Hanks informed Kalal that Hanks needed to work the machine he was currently assigned because it was higher off the ground and that he needed to use a bicycle while in the plant. Hanks generally stated that this was

due to a medical condition, but did not provide details regarding the medical condition. Hanks testified he was assigned to his specific machine as an accommodation as a result of a prior work-related injury.

Kalal allowed Hanks to continue keeping a bicycle near his station and continued to allow Hanks to work the same long-cutter machine.

Hanks has never been asked to work outside of any medical restrictions.

Hanks told Kalal that if Kalal put him on a different machine than the long-cutter machine Hanks would take legal action.

Hanks' table that he works his machine from is adjusted for his height to alleviate back pain. His work station is set up in a manner that meets his physical needs and there is no modification he feels would make the work station better. Hanks is not interested "in a different shift or a different job station or anything like that."

Hanks' failure to accommodate claim relies solely on Hanks' brief denial of access through the door closest to his parking stall in the fall of 2015 when the cypher lock was installed. Hanks testified he has been provided with all other accommodations for his alleged disabilities. During his deposition, Hanks was asked if he can list any facts that support his claim he was discriminated against on the basis of his disability and his response was, "right at this time, no." (Hanks dep. at 363).

Kalal has had numerous employees with work restrictions during his time in the cutter crib and generally at Spirit and has always accommodated those restrictions.

### Additional Facts

Fullerton, who retired in April, 2015, was the union steward for the cutter crib until some time in 2013. After he stepped down, Hanks became steward.

In his response to Spirit's motion for summary judgment, Hanks notes testimony from Fullerton that Hanks' assumption of the stewardship was "tumultuous." He also

notes Fullerton's additional testimony that a crib worker, Robert Lee, openly stated before various union representatives and in Hanks' presence that "that Nigger will never be my Union steward." (Fullerton dep. at 32). Another employee allegedly echoed this sentiment.

Spirit disputes that such a comment was made, and notes that the allegation is contradicted by Hanks' own testimony. In his EEOC charge, Hanks identifies several instances of alleged racial comments by specific reference to individual coworkers, but never makes any reference to the alleged comment by Lee. Neither Hanks nor Fullerton mentioned the alleged comment by Lee in their written statements to the EEOC.

In his deposition, Hanks stated there was some cursing at the time of his promotion to steward, but did not mention hearing any racial comments. Specifically asked if he knew of any racial comments he observed, other than those listed in the EEO complainst and addressed in Spirit's initial brief, Hanks replied in the negative.

Hanks also cites testimony that he was denied overtime because Ingram refused to train him. He argues in his response that Fullerton "later learned that [Ingram] referred to Mr. Hanks with the word 'nigger' when discussing the issue." (Dkt. 78, at 9). But no admissible evidence supports the alleged fact. Fullerton did not hear Ingram make this comment, he only repeated what he heard second-hand from another employee. As noted above, it remains uncontroverted that Hanks has not identified any particular training he lacked that prevented him from working overtime, and that indeed he successfully worked hundreds of hours of overtime.

Hanks's Response also notes other incidents involving Herod, the Process Mechanic who Hanks sometimes saw in the cafeteria and who told him of the noose incident. He notes that Herod also complained to Lucretia Taylor of an incident in which another worker used the term "bitch nigger," another incident in which a co-worker told Herod that other workers used this term behind his back, and a second noose incident, about a month after the first, in which a noose was left on his work table. However, while Herod mentioned the

first noose incident to Hanks, he did not tell him of the additional incidents. Hanks was not aware of these comments or events. Moreover, as noted earlier, Spirit's EEO office investigated Herod's complaints, interviewed witnesses, and supplied additional EEO training to the workers in Herod's shop. Afterwards, Herod testified that he has not experienced any additional racial harassment in the four years since.

### Conclusions of Law

The plaintiff contends that he was subjected to a hostile work environment at Spirit based upon events including certain comments allegedly made by his cutter crib co-workers, a picture posted on the crib bulletin board, being deprived of overtime, a lack of software for his cutter machine, and denial of access to a door near his parking place. The court finds that the plaintiff's claims of racial harassment are subject to summary judgment for two reasons.

First, the court finds that the cited incidents do not rise to the level of harassment. As noted earlier in the uncontroverted facts, Hanks was not deprived of overtime opportunities. Indeed, Hanks obtained hundreds of hours of overtime, working more overtime than almost everyone else in the crib.

The plaintiff essentially cherry-picks among the crib employees, and thus restricts himself to allegations that he did not have as much overtime as Fullerton and Ingram — the two crib employees who otherwise obtained the most overtime. Hanks obtained more overtime than the great majority of crib employees overall. Further, the facts establish that Hanks worked more overtime than Fullerton and almost as much as Ingram. The plaintiff has failed to show that the level of overtime Lebeda approved was racially motivated. To the contrary, the Hanks's own evidence indicates that Lebeda gave preferential overtime to Ingram because of a personal friendship, and to Fullerton because he was afraid of Fullerton as the crib union steward.

Similarly, there is no evidence that the placement of a lock on a side door of the building was either a substantial burden placed on the plaintiff, or that the action was racially motivated. The lock was placed on the door by the supervisor of a separate work unit, located immediately inside the door, and was motivated by concerns for worker safety. This supervisor gave the lock combination to workers who had visible difficulties with walking. After Hanks complained to Spirt, the company promptly arranged for him to have access. During the few days when he was unable to access the door, Hanks did have to walk farther outside the plant in order to reach the the crib. However, the total distance essentially remained the same.

Hanks was unable to identify the software his cutter lacked, or how its absence injured him in any substantial way. Similarly, there is no evidence that the absence of such programming was the product of or in any way related to racial bias.

This leaves the series of comments which Hanks experienced during his employment at the crib. Although Spirit was able to confirm only one of these comments, the 2012 comment by Ingram, the court assumes for purposes of summary judgment the truth of all of plaintiff's allegations. Thus, in 2012, Hanks heard Ingram, whom he had considered a friend, say "nigger please." At about the same time, he heard Lebeda make a reference to "jigaboo" music. About a year later, Fullerton alleges he heard Robert Lee use the term "nigger" in connection with Hanks' elevation to shop steward; Hanks has not testified he heard the comment.

In 2014, an unknown co-worker placed a picture on the crib bulletin board which was racially offensive. In 2015, Ingram again used the "N word," and co-worker Light used the term "boy." In both instances of these later incidents, Hanks overheard the comments, but they were not directed to him. And, at some unknown date and in an incident which was not reported to Spirit's EEO, Hanks overheard co-worker Garcia state that "a monkey could run this machine." This comment was apparently made in reference to Garcia's own

machine.

The issue before the court is not whether the comments overheard by Hanks were offensive in general, but whether the plaintiff's environment at Spirit was so "permeated with discriminatory intimidation, ridicule, and insult" so as to "alter the conditions of [his] employment and create an abusive working environment." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2004) (quotation omitted). This burden is not met "by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs. Instead, there must be a steady barrage of opprobrious racial comments." *Chavez v. New Mexico*, 397 F.3d 826, 831 (10th Cir. 2005). *See Gerald v. Locksley*, 849 F.Supp.2d 1190 (D. 2011); *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). The court considers the workplace environment from the perspective, both objective and subjective, of a reasonable employee in the plaintiff's position. *McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917, 923 (10th Cir.2001).

A single incident is generally insufficient to create a hostile work environment, unless it is "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Factors to be considered in deciding whether a work environment was hostile as a matter of law include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993).

Here, the comments cited by Hanks were indeed offensive, but occurred over a period of six years. The most egregious comments — the two instances in which Hanks personally heard the term "nigger" used to him— were made by a co-worker rather than a supervisor, occurred separately in 2012 and in 2015. In the case of the poster, Spirit immediately took corrective action and the incident was not repeated. There is no allegation that any of these comments actually interfered with Hanks' ability to work, or otherwise affected his employment.

Hanks argues in his response to Spirit's summary judgment motion that such relief should not be granted on the issue of the pervasiveness or severity of the harassment, and cites *Lounds v. Lincare*, 812 F.3d 1208 (10th Cir. 2015), in which the court held that the issue should have been presented to the jury. However, *Lounds* involved markedly different facts. Over the course of a few months in early 2012, the plaintiff in that case was personally subjected to a steady stream of racist commentary, including offensive remarks to her by her direct supervisor. *Id.* at 1213-14, 1225. In this case, by contrast, over the course of some six years, the plaintiff has identified a handful of incidents, many of which involved comments which he overheard but were not directed at him, and one of which (the "don't tase me, bro" t-shirt incident) he now acknowledges was not actually a racial comment. The most serious racial language, co-worker Ingram's use the term "nigger," occurred on two occasions in this six year period. The court finds that the plaintiff was not subjected to a severe or pervasive hostile working environment.[2]

Further, even if plaintiff had demonstrated events which rendered the workplace

---

[2] Plaintiff Hanks attempts to salvage his hostile environment claim by invoking the experience of another Spirit employee, Tim Herod, who allegedly found nooses in his work area. However, it is uncontroverted that, before the present case, Hanks had no knowledge of the second incident. As to the first, Hanks' knowledge was limited to a single, brief cafeteria conversation with Herod, who Hanks viewed as an acquaintance rather than a friend. Herod told Hanks had found a noose in his work area.

Other than this mention of the incident, which Hanks testified occurred "basically just in passing," (Hanks dep. at 368), Hanks knows nothing of the incident. Herod reported the incident to Spirit, and as far as Hanks knew, the incident was under investigation by the company. Hanks did not see the noose. Herod does not work in the cutter crib. Hanks testified, "I don't know where he works ... where he's located," or even which shop he is in. (*Id.* at 366). He doesn't know Herod's supervisor, and indeed does not know where in the 1.7 million square foot plant Herod actually works. Hanks made no attempt to find out anything further about the incident or follow up with Herod about the results of the investigation. After this brief conversation, Hanks sometimes saw Herod at the cafeteria, but he did not speak to him.

The court finds that the plaintiff did not experience a pervasive or hostile working environment arising from what he heard on one occasion from another employee working in another shop, an incident which the evidence establishes Spirit successfully investigated and remediated. Herod continues to work in his assigned shop and has reported no additional incidents of racial harassment since Spirit's investigation.

hostile, the uncontroverted facts do not establish that Spirit knew of and tolerated any hostile behavior. it. Rather, the evidence shows that the company took prompt and effective remedial action.

An employer is responsible for the harassment if it "had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998) (internal quotations omitted). Thus, if an employee establishes the existence of harassment, the court must determine whether the incidents of harassment were "so egregious, numerous, and concentrated as to add up to a campaign of harassment that the employer will be culpable for failure to discover what is going on." *Id.* at 675 (internal quotation marks and alteration omitted); *cf. Harsco Corp. v. Renner*, 475 F.3d 1179, 1188 (10th Cir.2007).

In his response to Spirit's motion, Hanks argues that he has not made any "admission that the actions of defendant Spirit were reasonable [sic] sufficient to avoid liability" for racial harassment. (Dkt. 76, at 12). But while plaintiff's brief may refuse to concede the issue, this cannot obscure clear admissions by the plaintiff in his deposition. Asked if Spirit's EEO officers "did anything wrong with regard to their process of investigating these complaints," Hanks responded, "I think they did their jobs ... as far as they could do."

More importantly, as noted earlier, the conclusion that Spirit effectively responded to Hanks's complaints rests on additional evidence and on contentions of fact which are not denied by plaintiff's memorandum. For example, when Hanks discovered a picture or poster on the crib bulletin board which he interpreted as racist, Spirit took immediate and effective action. The picture was removed and the company unsuccessfully tried to find who had posted it. Spirit secured the bulletin behind a locked glass door. Hanks has conceded that similar events have not occurred after Spirit's actions.

Similarly, when Hanks complained of the cypher lock on the door near his handicapped parking stall, Spirit restored his ability to use the door within a matter of days.

When Hanks complained of the use of racist language, Spirit undertook prompt investigation. The company did confirm Hanks' allegations in the August, 2012 incident involving Ingram, whom the company disciplined. Otherwise, the company was unable to find any witness to corroborate Hanks' allegations. Hanks has failed to show any evidence that Spirit was aware of any additional acts of harassment by Ingram, or by any other co-worker.

Hanks argues in his response that Spirit was obliged to "alter the dynamic of the workplace by transferring and/or discharging the wrongdoers." (Dkt. 76, at 13). But the plaintiff cites no authority for the proposition that an employer must terminate or transfer an employee automatically, based upon an unproven allegation of misconduct. Rather, an employer is responsible only when if fails to reasonably respond to allegations of harassment. *Adler*, 144 F.3d at 676.

Here, the plaintiff has failed to show that Spirit had actual or constructive knowledge of ongoing harassment, or that it unreasonably failed to take action in response to reported incidents of harassment. The evidence shows that Spirit actively investigated Hanks' complaints. If the company was able to corroborate a complaint, the responsible employee was disciplined or counseled. Hanks has acknowledged that Spirit's EEO office investigated his complaints "as far as they could," and his response to the motion for summary judgment fails to challenge the vast majority of Spirit's contentions of fact which document its remedial actions.[3]

---

[3] Spirit also argues that it is not responsible for any alleged harassment by the supervisors Lebeda or Kalal since it exercised reasonable care to address Hanks' complaints, and Hanks failed to avail himself of opportunities to challenge their conduct. An employer may avoid vicarious liability through "an affirmative defense—the *Faragher* defense—by showing that the employer 'exercised reasonable care to avoid harassment and to eliminate it when it might occur,' and that the complaining employee 'failed to act with like reasonable care to take advantage of the employer's safeguards.'" *Debord v. Mercy Health Sys. of Kansas*, 737 F.3d 642, 650 (10th Cir.2013) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998)). *See also Burlington Indus. v. Ellerth*, 524 U.S. 742, 758-59 (1998).

Spirit argues it is entitled to this defense because it took corrective action as to

The plaintiff also complains that Spirit subjected him to disparate treatment on account of race in violation of 42 U.S.C. § 1981. The court finds that the plaintiff's claim fails because he has failed to show the existence of an adverse employment action, thereby demonstrating a prima facie case of discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (in hiring cases, a prima facie case requires plaintiff to prove "that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination"); *Davis v. Unified School Dist. 500*, 750 F.1168, 1170 (10th Cir. 2014) (plaintiff may prove discrimination "either by direct evidence of discrimination, or by adhering to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)"); *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (plaintiff must show he is a member of a protected class and suffered an adverse employment action under circumstances giving rise to an inference of discrimination); *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

An adverse employment action requires some event causing "a significant change in employment status." *Ellerth*, 524 U.S. at 761. In the *McDonnell Douglas* analysis, an adverse employment action is limited "to adverse actions that affect employment or alter the conditions of the workplace." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 62 (2006) (alteration omitted). These actions involve a significant changes in status, including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (internal quotation marks omitted).

---

the one complaint made against Lebeda, with respect to the alleged comment about "jigaboo music." The company was unable to determine the truth of the allegation (which Lebeda denied), but nonetheless required counseling for Lebeda. Otherwise, Hanks made no complaints against either Lebeda or Kalal during the time they acted as his supervisors. Hanks fails to address the *Faragher* defense in his response to the motion for summary judgment, and the court accordingly grants Spirit's motion to the extent it invokes this defense.

The facts show that the plaintiff was not deprived of access to his work area on account. Rather, out of concerns for workplace safety arising from too many workers passing through her work area, the manager of a separate work unit locked the plant door near plaintiff's handicapped parking stall, and limited access to workers with visible difficulties in walking. While this increased the distance the plaintiff had to walk to enter the building, the total distance plaintiff walked to his work station remained the same. When the plaintiff complained to Spirit, access to the door was quickly restored.

While plaintiff complains that he was not given access to software for sharpening drill bits or cutters, he could not identify in his deposition which programs he wanted but was not given. He also could not identify programs which other machine operators had that he did not have. During the relevant time period, the plaintiff was the only person running the ANCA with large cutters.

Spirit has supplied evidence that, for purposes of efficiency, its cutter operators do not all run the same machines. Each is specialized, and not every cutter can perform all types of work. While most of the machines are technically capable of running each type of cutter, assigning work to cutters indiscriminately would require significant down time in adjusting the cutters, and does not make business sense. In the course of some six years, the plaintiff could identify one or two instances when he received a job that he could not complete because of software limitations.

Plaintiff complains that he was deprived of overtime opportunities, and claims that Lebeda told him he would not be given overtime. However, as discussed earlier, the uncontroverted facts show that Hanks was not deprived of overtime, and in fact worked more overtime, 912.4 hours, than most of the white workers in the cutter crib.[4]

_____

[4] The plaintiff supports his claim that he was deprived overtime by focusing on three white workers (Light, Fullerton and Ingram) who, he contends, worked more overtime, rather than comparing his overtime to workers in the crib overall. But even as to these workers, the evidence fails to show any racial bias. Excluding the first quarter of 2012, when Hanks was first assigned to the ANCA machine, Hanks worked more

And even if the amount of overtime received by plaintiff were considered an adverse employment action, the court finds that Spirit has presented a legitimate, nondiscriminatory reason for its overtime decisions. The evidence shows that Hanks received limited overtime in 2011 because Hanks was then new to the shop and working a conventional machine, rather than the more advanced ANCA. In addition, he was on leave for some five weeks in the fall, and returned with restrictions on the number of hours he could work.

When the a position at an ANCA machine opened through retirement in January of 2012, Lebeda chose Hanks over other, white workers. Once Hanks learned the machine, he obtained overtime in significant amounts. Moreover, as noted earlier, the machines were operated on a specialized basis. As a result, the opportunities for overtime varied as the demand for particular cutters fluctuated. In sum, the court finds that the plaintiff did not suffer from a materially adverse employment action, and has failed to set forth a prima facie case under § 1981.

For the same reason, the court grants summary judgment as to plaintiff's claim of unlawful retaliation. Such a claim requires that, as a response to engaging in protected conduct, an employee has been subjected to a materially adverse employment action. *Davis v. Unified School Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014). An adverse employment action, in this context, means the acts "must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Thus, "the inquiry is an objective one, and not based on a 'plaintiff's personal feelings.'" *Daniels v. United Parcel Serv.*, 701 F.3d 620, 638 (10th Cir. 2012) (quoting *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009)). The court finds that Hanks did not experience adverse employment action by Spirit, whether through the extremely brief loss of the ability to enter by the side door, the economic decision to use specialized software for each cutter machine, or

---

overtime than Light and Fullerton, and almost as much as Ingram.

otherwise.

Even if plaintiff had suffered an adverse employment action, the facts fail to demonstrate that it was caused by his participation in protected activity. Beginning in January of 2012, after Lebeda assigned him to the ANCA machine, the plaintiff received more and more overtime. This occurred after the plaintiff began to file his various complaints in August, 2012.

The evidence further establishes that the limited differences in treatment he experienced arose for reasons other than retaliation. For the limited period where Lebeda gave plaintiff less overtime than Ingram or Fullerton, the evidence is that this occurred because Lebeda was friends with Ingram, and feared Fullerton as the crib union steward. Similarly, the uncontroverted evidence is that McCracken placed the cypher lock on the plant door because of concerns about the safety hazard created by so many workers using the side door. It is uncontroverted that when she had the lock installed, McCracken knew nothing of the plaintiff's complaints.

Spirit also moves for summary judgment as to plaintiff's claims under the Americans with Disabilities Act (ADA). Spirit argues, among other things, that it reasonably accommodated plaintiff by restoring his access to the door within days of his request, and that the various workplace events cited by the plaintiff do no reflect discrimination on the basis of disability. The plaintiff has withdrawn his ADA claims and does not address the issues in his response.

Finally, Spirit seeks a determination that plaintiff is not entitled to punitive damages because there is no evidence it acted in bad faith in respect to any of the events cited by the plaintiff. *See EEOC v. Gaddis*, 733 F.2d 1373, 1380 (10th Cir. 1984) (punitive damages are appropriate where the discriminated was "malicious, willful, and in gross disregard of [plaintiff's rights]"). *See also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (under 42 U.S.C. § 1981, "an employer must at least discriminate in the face of a perceived risk that its

actions will violate federal law to be liable in punitive damages"). An employer will not be subject to punitive damages if it adopts anti-discrimination policies, makes a good faith effort to educate its employees about the policies and the laws against discrimination, and makes good faith efforts to enforce the policies. *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1138 (10th Cir.2006). Here, there is substantial evidence that Spirit created appropriate non-discrimination policies, that it instructed its workers about those policies, and that it responded to plaintiff's complaints in a good faith effort to address his allegations.

The plaintiff responds by acknowledging Spirit's non-discrimination policies, but argues they do not compel an award of summary judgment, citing *Cadena v. Pacesetter Corp.*, 224 F.3d 1203 (10th Cir. 2000). In *Cadena*, the court determined that the issue of punitive damages should have been submitted to the jury where there was "substantial evidence suggesting that Pacesetter knew about Bauersfeld's sexually harassing conduct but failed to take any action to stop it." *Id.* at 1210. The court stressed the "ample evidence" that supervisors knew of the sexual harassment but refused to address it. *Id.* at 1209.

> For example, Cadena testified that when she complained to Hawley both in November 1996 and February 1997, Hawley stated that Whittinghill and other corporate officers were already cognizant of Bauersfeld's sexually harassing conduct but would not address it because he made too much money for the company. Moreover, Greg Fuller, Cadena's co-worker, testified that when he complained to Whittinghill about Bauersfeld's offensive behavior in February 1997, Whittinghill merely responded "that things had been that way for a long time at Pacesetter, that the business world was full of pricks like Charlie ... [a]nd ... to get used to it because that is the way the business world was." Fuller's testimony suggests that Whittinghill was previously aware of Bauersfeld's conduct but that neither he nor anyone else at Pacesetter intended to stop it. Finally, Cadena testified that the first time Whittinghill spoke with her about her complaints, he justified Bauersfeld's behavior as a "compliment" to Cadena and did not offer to take corrective action.

*Id.* at 1208-09.

*Cadena* bears little resemblance to this case. The facts establish that Spirit investigated each of plaintiff's complaints in a manner consistent with its policies against discrimination. When it was able to confirm the allegations in a complaint, it took remedial or disciplinary

action against the workers involved.

IT IS ACCORDINGLY ORDERED this 31st day of August, 2017, that the defendant's Motion for Summary Judgment (Dkt. 68) is hereby granted.


      ___s/ J. Thomas Marten_____
      J. THOMAS MARTEN, JUDGE